# The Robert Graves Co. *et al* v. McDade, Boyle & Butler, *et al.*

*Creditors Bill to set aside Conveyances as Fraudulent.*

1. *Conveyance by debtor to creditor; validity as against other creditors.*—In a suit to set aside a transfer of property to a creditor of the grantor, as in fraud of other creditors, when complainants' claims were contracted before the transfer, the onus is on the purchasing creditor to show, by clear and satisfactory evidence, not only a *bona fide* debt, but also that the amount thereof was not materially less than the fair and reasonable value of the property; and when a near relationship exists between him and the debtor, it is a fact, like confidential relations, relevant to be considered, in connection with all the other circumstances tending to show fraud.

2. *Dower; when right to barred.*—When more than twenty years has elapsed since the death of the husband, a claim of dower will be presumed to have been relinquished, or otherwise barred or cut off.

APPEAL from Montgomery Chancery Court.

Heard before Hon. JERE N. WILLIAMS.

The facts of this case are sufficiently stated in the opinion.

W. A. GUNTER, for appellant.

D. T. BLAKEY, *contra.*

HARALSON, J.—1. This was a general creditor's bill, filed on the 19th day of August, 1892, by appellants, against G. W. McDade, Jr., P. T. Boyle and C. E. Butler, composing a partnership doing business under the name of McDade, Boyle & Butler, and G. W. McDade, Sr., Mrs. C. E. Butler (otherwise known in the suit as Sarah A. Butler), and D. F. Boyle. G. W. McDade,

Sr., died pending the suit, and it was revived against the executor of his estate, W. H. Micou, who appeared and became party defendant. The complainants were creditors of said defendant partnership; and the bill sought to set aside and declare fraudulent and void two conveyances, (1) a sale made on the —— day of May, 1892, by defendant firm to Geo. W. McDade, Sr., and Sarah A. Butler, of their entire partnership stock of goods and business, in Montgomery, Alabama, the alleged consid-·eration being a debt of $1,040, due to G. W. McDade, Sr., and a debt of $4,000, or over, due to Mrs. Butler. (2) A warranty deed executed on the 12th day of May, 1892, by said P. T. Boyle, conveying for the alleged consideration of $1,200, an undivided one-third interest in several lots in Montgomery, Alabama.

G. W. McDade, Sr., was the father of G. W. McDade, Jr. Sarah Butler was the wife of C. E. Butler, and D. F. Boyle was the brother of P. T. Boyle.

2. The bill avers, "that no real and *bona fide* sale of said stock and business of said McDade, Boyle & Butler has ever taken place; that said firm believing that by going through the form of a sale merely, they could put their property beyond the reach of creditors, by the use of a different name, have attempted to make said sale; that the members of said firm are now in possession and control of said business, and have been, ever since said attempted sale, in all respects as they were before said sale; that although they claim to be running said business for and in the name of G. W. McDade, Sr., and Mrs. C. E. Butler, they are in truth and in fact the beneficiaries of said sale, and that said sale is colorable and fraudulent, and was entered into with the knowledge and consent of all parties thereto, as an arrangement to put said firm's property, at least temporarily, beyond the reach of the creditors of said firm, and to put the said McDade, Boyle & Butler in the control and management thereof, for their own benefit; that the said firm was not indebted to said Mrs. C. E. Butler in the sum of $4,000, nor any part thereof; that said sale is fraudulent, and made upon a fictitious indebtedness so far as Mrs. Butler is concerned; that the sale of the realty made by P. T. Boyle to his brother, Daniel Boyle, was made on the alleged consideration of $1,200 to him in hand paid; that that sum is an inadequate consideration for said

property ; that at the time of said sale P. T. Boyle was insolvent, and that said Daniel Boyle knew of his insolvency ; that said sale was made for the sole purpose of shielding it from the just debts of said P. T. Boyle, and that his brother Daniel knew of said purpose and participated therein and that the consideration purchase money for said realty did not pass nor any part thereof.''

The defendants demurred to the bill on the ground of multifariousness and because complainants had an adequate remedy at law. The demurrers were overruled and the cause having been submitted on pleadings and proof, the court decreed that complainants were not entitled to the relief prayed for, and dismissed the bill.

The validity of the debts of complainants and their existence at the time of the two conveyances is not disputed.

3. In a suit to set aside a transfer of property to a creditor of the grantor, as in fraud of the other creditors, when complainant's claims were contracted before the transfer, the onus is on the purchasing creditor to show, by clear and satisfactory evidence, not only a *bona fide* debt, but also that the amount thereof was not materially less than the fair and reasonable value of the property ; and when a near relationship exists between him and the debtor, it is a fact, like confidential relations, relevant to be considered, in connection with all the other circumstances tending to show fraud.—*Lehman, Durr & Co. v. Greenhut,* 88 Ala. 478 ; *Moog v. Farley,* 79 Ala. 246 ; *Frances v. Page,* 97 Ala. 377; *Calhoun v. Hannon,* 87 Ala. 277 ; *Teague v. Lindsay,* 106 Ala. 266; *Troy Fertilizer Co. v. Norment,* 18 So. Rep. 201. Tested by this rule of law, let us examine the transaction between P. T. Boyle and his brother.

4. At the time the conveyance was made to D. F. Boyle, he was a few months more than twenty-one years of age, he and his brother, as it seems, were and had been, living at the same house with their mother and sister in Montgomery. Their father had died years before, leaving no property except the Montgomery city lots, the P. T. Boyle undivided interest in which, was the subject-matter of the conveyance. Daniel F. Boyle had no other property and no sources of income, so far as is made to appear, except his wages as a machinist. His testimony is, that he let his brother have the last of

the $1,200 two years before the partnership began business, which would be March 1889; that all the money he loaned his brother was from his savings from his wages as a machinist, and "that he served his time" at the Montgomery Iron Works, four years. From his testimony he began this service in 1885. He was then not more than 14 years old. The expiration of this period of four years, would be about the time he says, it is his "best recollection" that he let his brother have the last of the $1,200. When he and his brother are examined about the details of the transaction between them, their testimony is inconsistent and that of each of them improbable. P. T. Boyle represents that he got all of the $1,200 from his brother at one time; that it was handed to him at their home, and was in greenbacks, gold and silver; that his brother was keeping it at home in his trunk &c. On the contrary, the testimony of Daniel Boyle is, that this money was borrowed from him from time to time, in small amounts; that he "did not know why his brother was continually borrowing from him;" that he did not know how often his brother borrowed from him, whether every week or every day. P. T. Boyle's best recollection is, that he got this money five or six months before he went into business,—March 1891. Daniel Boyle's best recollection is, that he had obtained the last of it, two years before that time. P. T. Boyle assigns no reason for borrowing this sum of money. When he received it, he kept some of it at home and some of it in his pocket, and used it along for different purposes. Without some reason,—special or otherwise,—why should he borrow this money from his brother? Certainly it was not for safe-keeping. He does not know how much of this sum was in greenback, how much in gold or how much in silver.

Daniel Boyle is equally indefinite. He cannot tell the amount. of a single one of the numerous loans he states he made, nor the date of any one of them. He does not know the largest or the smallest amount his brother got from him, at any one time. He cannot even approximade the number of loans made. He took no note or other evidence of the loan or loans. He kept no accounts. He had no agreement about interest or when the money would be repaid to him. At the time of the settlement, and just before the deed was made to him,

he told his brother that he thought that he owed him about $1,200, and his brother replied, he was satisfied with that amount; that they "worked out" the value of his brother's interest in the property, less the taxes, and this value and the debt came out the same,—"that was about what it was." We hold that said Daniel Boyle has not established the consideration for his deed by clear and convincing evidence.

We also think that the value of the property conveyed was materially more than the amount of the alleged debt. The property conveyed was P. T. Boyle's undivided interest in the real estate of his deceased father, the said city lots. Disinterested witnesses put the value of this property, at the time of the conveyance, at $8,000 and $8,500, respectively. The Boyles testify that there was $2,000 taxes due on the property, but they do not explain how or why. But admit the contention, and allow the value of the property to be $8,000,—the smaller of the estimates of its value placed on it by the witnesses,—and this leaves the value at $6,000. There were three children; hence the interest of each was of the value of $2,000. This is materially more than the alleged consideration.

It is urged that the widow was entitled to dower in this property, but this is not shown. On the contrary, the evidence shows that the husband and father died more than twenty years before the conveyance was made. That number of years raises the presumption that the claim was relinquished or otherwise barred or cut off.— *Barksdale v. Garrett*, 64 Ala. 277; *Elyton Land Co. v. Denny*, 96 Ala. 336.

5. The evidence adduced to establish the debt to Mrs. Butler is also conflicting and indefinite. Mr. and Mrs. Butler are the only witnesses examined on this subject. The substance of Mrs. Butler's testimony is, that she and her husband moved to Montgomery in the year 1889; that she loaned to the partnership $4,850; that all of this money was sent to her, by her mother, from Hendersonville, Ky., Franklin, Indiana, and "from different places." Her mother and father had no property except two houses and lots, one in Shelbyville and one in Hendersonville, Ky. What their value was or whether they were paid for or encumbered or not, she did not know. She does not know when this money was sent to her,

nearer than that it was "about three years ago, perhaps not so long. It may have been only two years ago." She does not remember when the last amount was sent to her, but it was not within a year past. She does not know when these remittances were made, or their amounts. They were sent by registered letter and by mail, and about as many were made by the one means as by the other. All of them were addressed to her by the name of Agnes Butler. At one time, she received $200, by express. She loaned this money to the partnership, as fast as she received it, and took partnership notes for it. And yet her testimony tends to show, some of the money was received after the partnership went out of business,—May 1892. Her deposition was taken September 1894. She had no recollection of how often the money was sent or how many remittances.

Her husband's testimony is just as unsatisfactory. He does not know the amount of any loan except by his best judgment, though he was a partner in the firm that borrowed the money and the husband of the lender. He does not know certainly the aggregate amount of the loans. He says his wife's mother died here in Montgomery two years ago, to-wit, Sept. 1892. And yet his wife speaks as though her mother was still living, using such expressions as, "my mother is *not now* occupying a particular house, and my brother is not now living with my mother." Although Mrs. Butler represents that all this money was sent to her by her mother, her husband testifies, that $3,500. of it was sent to her by her father as her share of the proceeds of the sale of her mother's property, after her death. The mother died at least four months after the partnership was dissolved. He afterwards states, that the father was here in Montgomery and brought some of the $3,500. with him. We hold that Mrs. Butler has failed to establish the existence of any debt due to her.

6. The business of this co-partnership was paper hanging. They commenced business in March, 1891. On October 19th of that year, their written statement to one of complainants, shows that they had $4,600 assets, and only $600. firm and individual indebtedness. They ceased to do business about 15th May, 1892. About seven months after this statement was rendered, they sell out, with a stock of between four and five thousand

dollars in value. The claims of complainants amount in round numbers, to $3,900. If they obtained $5,890. from Mrs. Butler and G. W. McDade Sr., it would appear they absorbed money at the rate of between $900. and $1,000. per month. When they sold out, the partners remained in possession as before, conducting the business and buying and selling goods, claiming to be acting as agents for Mrs. Butler and McDade Sr., who received no returns from the business ; and as stated by Mrs. Butler, "all the results of the business were eaten up by the expenses. Part of the expenses consisted of the wages paid to McDade, Boyle & Butler."

The further history of this stock of goods is that it was afterwards burned. And P. T. Boyle and C. E. Butler sold the few damaged goods, rescued from the fire, the proceeds of which, according to Mrs. Butler, "went to pay the expense that the firm was under." The stock was insured in the name of the McDade-Butler Co.,—the new firm. On this insurance, five hundred and ninety some odd dollars was collected. It is uncontradicted, that each one of the partners was to be paid $18. per week for running the business for Mrs. Butler and G. W. McDade Sr. Mrs. Butler in her deposition admits—"It was understood that they were to get $18. per week, at the time the business was made over to us. That was part of the trade."

7. As to the case against Geo. W. McDade Sr., the bill alleges (paragraph 5) "that some time in May of this year, the said McDade, Boyle & Butler, claim to have sold their entire stock and business of their said firm, to Geo. W. McDade Sr., the father of the McDade of said firm, upon a consideration of, to-wit, $1,040. indebtedness, and to Mrs. C. E. Butler, wife of the said Butler of said firm, upon a consideration of, to-wit, $4,000. or over, indebtedness." The next averments of the bill as to said McDade, Sr.'s connection with the transaction, are found in section 7, from which we have quoted at length, in the first part of this opinion. The only parts of this section, especially applicable to said McDade, Sr., are—"Orators aver that no real and *bona fide* sale of said stock and business of said McDade, Boyle & Butler has ever taken place ;" that it was a mere form of sale ; that the vendors were" in truth and fact the beneficiaries of said sale, and that said sale is colorable

and fraudulent and was entered into, with the knowledge and consent of all parties interested as an arrangement to put said firm's property at least temporarily beyond the reach of the creditors of said firm; that the claimed indebtedmess of said firm of $4,000., in the sale of said business to Mrs. C. E. Butler, did not exist; that C. E. Butler, her husband, was not indebted to her in that amount, nor in any part of it, and *"that the sale is fraudulent and made upon a fictitious indebtedness, so far as the debt that Mrs. Butler claimed, is concerned."* The last words, italicized by us, are significant, as to said McDade, Sr. Nowhere in the bill is there an explicit averment, that the alleged indebtedness of said firm to said McDade, Sr., as constituting a ground of fraud in the transaction, did not exist; but, the alleged indebtedness of Mrs. Butler is denied in the manner indicated, as it would seem, to rest the fraudulent character of the sale upon the fictitiousness of her debt alone, and not upon that of McDade, Sr. All else of fraud that is averred may be true, without questioning the *bona fides* of the McDade debt. When it is averred, for instance, that the sale was colorable and fraudulent, and was entered into, with the knowledge and consent of all parties thereto, reference was had, evidently, not to the non-existence of the McDade debt, the evidence of which is not denied, but to the preceding averment, that the form of a sale had been gone through with by said firm, to put their property beyond the reach of their creditors, and upon the non-existence of Mrs. Butler's debt, which is positively averred. Why deny her debt so explicitly, and not that of McDade, if complainants question the latter?

Now, McDade, Sr. was required to answer under oath, which made his answer evidence. Complainants evidently had confidence in him.

In answer to said section 5, quoted above, which averred no more as to McDade's debt, than that it was *claimed* that such an indebtedness existed, he says, that he admits the allegations of that section, except the word pretended (claimed), and adds, "that the sale mentioned therein was actual, *bona fide* and for full value." This, by all fair construction, was an averment of his, that the debt which it was said he claimed, was a real, *bona fide* and not fictitious claim. It is even a more direct and explicit averment of its existence, amount and *bona fides*

than the bill makes, if any, questioning these facts. Indeed, throughout the bill, and in the argument of counsel for appellants, McDade's debt does not seem to be disputed, and the fraud of the transaction is rested on other grounds. The evidence of C. E. Butler, though not full, in proof of this debt, is very persuasive of its existence. He does show, that McDade was security for it at the bank; that the firm never paid it, and McDade got credit for it on the books of the firm, after its maturity. And DeYampert, in his evidence detailing a conversation with McDade, says that McDade claimed that this debt, mentioning its amount, was due and owing to him.

The other allegations of fraud are as fully and explicitly denied in the answer as they are averred in the bill. The allegation of a benefit reserved is general, and not that it consisted in an agreement at the time of the sale—and as part of it—to pay the vendors, after the sale, a salary, as clerks, to close out the business; but the averment is, as before shown, "that said firm are the beneficiaries of said sale and that said sale is colorable and fraudulent, entered into with the knowledge and consent of all parties thereto, as an arrangement to put said firm's property, at least temporarily beyond the reach of creditors," and this is specifically denied by McDade in substantially the same language it is charged. Mrs. Butler's evidence, that it was a part of the trade to pay each member of the selling firm $18 a week, to close out the business, is not sufficient to fix a knowledge and participation of that arrangement on McDade Sr., as against the denials in his sworn answer, of any reservation of benefit reserved to the vendors. Indeed, we feel morally certain, upon the allegations of the bill and answer and proof, that as to McDade, Sr., his connection with the transaction was with no bad intent towards the creditors of said firm—to delay hinder or defraud them. He received no part of the proceeds of the sale of the goods, and lost his entire debt. He evidently purchased, to the amount of his debt, with the hope of its benefitting, rather than injuring the creditors.

8. The conclusion we reach is, that the decree of the chancellor, as to Geo. W. McDade, Sr., or his administrator, must be affirmed; and as respects the other de-

fendants, that said sale of the real estate by P. T. Boyle to Daniel F. Boyle, as described in the conveyance of the former to the latter, on the 12th May, 1892,—Exhibit J. to the bill—is fraudulent and void as to complainants ; and that the sale of said stock of goods by said firm of McDade, Boyle and Butler to Mrs. Sarah A. Butler, was likewise fraudulent and void as to complainants ; and a decree will be here entered so declaring. The cause will be remanded to the chancery court, for other and further proceedings, under its rules, to ascertain the amount of complainants' debts, and for such other decree as may be deemed proper for the collection of the same.—*Dickinson v. Nat. Bank*, 98 Ala. 546; *Clements v. Moore*, 6 Walt. 299 ; Wait on Fraud. Conveyances, § 177.

Affirmed in part, rendered in part, and remanded.